**BAKER & HOSTETLER LLP**

45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Marc E. Hirschfield
Keith R. Murphy

*Attorneys for Irving H. Picard, Trustee for the*
*Substantively Consolidated SIPA Liquidation of Bernard L. Madoff*
*Investment Securities LLC and Bernard L. Madoff*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION,<br><br>               Plaintiff-Applicant,<br><br>    v.<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>               Defendant. | Adv. Pro. No. 08-01789 (BRL)<br><br>SIPA LIQUIDATION<br><br>(Substantively Consolidated) |
| In re:<br><br>BERNARD L. MADOFF,<br><br>               Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>               Plaintiff,<br><br>    v.<br><br>MARION MADOFF,<br><br>               Defendant. | Adv. Pro. No. _____ (BRL) |

**COMPLAINT**

Irving H. Picard (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS" or, alternatively, the "Company") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq*. ("SIPA"), and the substantively consolidated estate of Bernard L. Madoff individually ("Madoff"), by and through his undersigned counsel, for his Complaint against Marion Madoff ("Mrs. Madoff"), based on actual knowledge and information and belief, states the following:

## NATURE OF PROCEEDING

1.      This adversary proceeding arises from the massive Ponzi scheme perpetrated by Madoff. Over the course of the scheme, there were more than 8,000 client accounts at BLMIS. In early December 2008, BLMIS generated client account statements for its approximately 4,900 open client accounts. When added together, these statements purport that clients of BLMIS had approximately $65 billion invested with BLMIS. In reality, BLMIS had assets on hand worth a small fraction of that amount. On March 12, 2009, Madoff admitted to the fraudulent scheme and pled guilty to 11 felony counts, and was sentenced on June 29, 2009 to 150 years in prison. Mrs. Madoff received avoidable transfers from BLMIS as described below.

2.      Mrs. Madoff has received substantial transfers from BLMIS from 1996 to 2008. In addition to the millions of dollars diverted for her benefit as set forth in detail herein and in the Trustee's complaint against Peter Madoff (Adv. Pro. No. 08-01789 (BRL), Docket No. 1), Mrs. Madoff received a total of more than $1,500,000 in "salary" during this period for a "no-show" job. BLMIS records and the Trustee's investigation provide no evidence that she ever performed any services of any kind for the Company for which she would have been entitled to compensation.

3.      In addition to this salary, Mrs. Madoff enjoyed the privilege of having two corporate charge cards, paid for by BLMIS, which she used to charge personal expenses, such as

restaurant outings, luxury trips, and shopping, again all ultimately at the expense of BLMIS's customers. Mrs. Madoff was also the beneficiary of millions of dollars of transfers from BLMIS, which paid for multiple homes for her and Peter Madoff for which she should be held jointly and severally liable. Whether or not Mrs. Madoff knew of the fraud her brother-in-law perpetrated at BLMIS, during the past two- and six-year statutory periods and beyond, she received substantial sums from BLMIS for which BLMIS received no corresponding benefit or value and to which Mrs. Madoff had no good faith basis to believe she was entitled. The purpose of this action is to recover that money to the extent possible for the benefit of BLMIS and its defrauded customers.

4. At this time, the Trustee has identified at least $14,132,688 of customer funds received by Mrs. Madoff.[1] This amount, for the reasons set forth below, should be returned to the Trustee for the benefit of the customers of BLMIS. Included in this amount is $8,403,179 Mrs. Madoff received during the six-year period prior to Madoff's arrest and the demise of BLMIS on December 11, 2008. At least $3,452,687 of this amount is comprised of fraudulent transfers Mrs. Madoff received during the two-year period prior to December 11, 2008. At least $5,729,509 was received by Mrs. Madoff prior to the six year statutory period.

5. Accordingly, judgment should be entered in no less than the total amount of $14,132,688 (exclusive of any additional amounts the Trustee later discovers) so that, to the extent possible, the funds can be returned to the Trustee for the benefit of all the victims of the Madoff Ponzi scheme.

6. This adversary proceeding is brought pursuant to 15 U.S.C. §§ 78fff(b), 78fff-1(a), and 78fff-2(c)(3), 11 U.S.C. §§ 105(a), 541, 544, 548(a), 550(a), and 551 (11 U.S.C. §§ 101 et. seq. are referred to herein as the "Bankruptcy Code"), the New York Fraudulent Conveyance

---

[1] A detailed list of all transactions included in this amount is attached as Exhibit A. The information contained therein is based on the results of the Trustee's investigation to date and the records available to Him. The Trustee expressly reserves the right to amend and/or supplement this list as more information becomes available.

Act  (New York Debtor and Creditor Law § 270 *et seq*. (McKinney 2001) ("DCL")), and NY

CPLR 203(g) and 213(8) (McKinney 2001) to set aside fraudulent transfers and fraudulent

conveyances, and pursuant to New York common law for a constructive trust, an accounting, and

to recover the money improperly received by Mrs. Madoff from BLMIS due to conversion and

unjust enrichment.

### THE DEFENDANT

7.       Defendant Marion Madoff, age 64, is married to Peter Madoff, the Senior

Managing Director and Chief Compliance Office for BLMIS and the brother of Bernard L.

Madoff.  She resides in Old Westbury, New York.   Mrs. Madoff is a BLMIS insider as defined

by Section 101(31) of the Bankruptcy Code.

### JURISDICTION AND VENUE

8.       This is an adversary proceeding commenced before the same Court before which

the main underlying SIPA proceeding, No. 08-01789 (BRL) (the "SIPA Proceeding"), is

pending.  The SIPA Proceeding was originally brought in the United States District Court for the

Southern District of New York as *Securities & Exchange Commission v. Bernard L. Madoff*

*Investment Securities LLC, et al.*, No. 08 CV 10791 (the "District Court Proceeding") and has

been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28

U.S.C. § 1334(b) and 15 U.S.C. §§ 78eee(b)(2)(A), (b)(4).

9.       This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (H) and (O).

10.      Venue in this district is proper under 28 U.S.C. § 1409.

### BACKGROUND, THE TRUSTEE, AND STANDING

11.      On December 11, 2008 (the "Filing Date"), Bernard Madoff was arrested by

federal agents for violation of the criminal securities laws, including, *inter alia*, securities fraud,

investment adviser fraud, and mail and wire fraud.  Contemporaneously, the Securities and

Exchange Commission ("SEC") filed a complaint in the District Court which commenced the District Court Proceeding against Madoff and BLMIS. The District Court Proceeding remains pending in the District Court. The SEC complaint alleged that Madoff and BLMIS engaged in fraud through the investment advisor activities of BLMIS.

12.     On December 12, 2008, The Honorable Louis L. Stanton of the District Court entered an order appointing Lee S. Richards, Esq. (the "Receiver") as receiver for the assets of BLMIS.

13.     On December 15, 2008, pursuant to 15 U.S.C. § 78eee(a)(4)(A), the SEC consented to a combination of its own action with an application of the Securities Investor Protection Corporation ("SIPC"). Thereafter, pursuant to 15 U.S.C. § 78eee(a)(4)(B), SIPC filed an application in the District Court alleging, *inter alia*, that BLMIS was not able to meet its obligations to securities customers as they came due and, accordingly, its customers needed the protections afforded by SIPA.

14.     Also on December 15, 2008, Judge Stanton granted the SIPC application and entered an order pursuant to SIPA (the "Protective Decree"), which, in pertinent part:

(a)     appointed the Trustee for the liquidation of the business of BLMIS pursuant to 15 U.S.C. § 78eee(b)(3);

(b)     appointed Baker & Hostetler LLP as counsel to the Trustee pursuant to 15 U.S.C. § 78eee(b)(3); and

(c)     removed the case to this Court pursuant to 15 U.S.C. § 78eee(b)(4).

By this Protective Decree, the Receiver was removed as Receiver for BLMIS.

15.     By orders dated December 23, 2008 and February 4, 2009, respectively, the Bankruptcy Court approved the Trustee's bond and found that the Trustee was a disinterested person. Accordingly, the Trustee is duly qualified to serve and act on behalf of the estate of BLMIS.

16.     At a plea hearing (the "Plea Hearing") on March 12, 2009, in the case captioned *United States v. Madoff,* Case No. 09-CR-213(DC), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York.  At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]."  Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff,* No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50). Additionally, Madoff asserted, "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." *Id.*  On June 29, 2009, Madoff was sentenced to a prison term of 150 years.

17.     On August 11, 2009, a former BLMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme.  At a Plea Hearing on August 11, 2009 in the case entitled *United States v. DiPascali,* Case No. 09-CR-764 (RJS), DiPascali pled guilty to a ten-count criminal information.  Among other things, DiPascali admitted that the fictitious scheme had begun at BLMIS since at least the 1980s.  Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali,* No. 09-CR-764 (RJS) (S.D.N.Y. Aug. 11, 2009) (Docket No. 11).

18.     As the Trustee appointed under SIPA, the Trustee is charged with recovering and paying out customer property to BLMIS's customers, assessing claims, and liquidating any other assets of the firm for the benefit of the estate and its creditors.  The Trustee is in the process of marshalling BLMIS's assets, and the liquidation of BLMIS's assets is well underway.  However, such assets will not be sufficient to reimburse the customers of BLMIS for the billions of dollars that they invested with BLMIS over the years.  Consequently, the Trustee must use his authority under SIPA and the Bankruptcy Code to pursue recovery from, among others, Mrs. Madoff, who received avoidable transfers to the detriment of other defrauded customers whose money was

consumed by the Ponzi scheme. Absent this or other recovery actions, the Trustee will be unable to satisfy the claims described in subparagraphs (A) through (D) of 15 U.S.C. § 78fff-2(c)(1).

19.     Pursuant to 15 U.S.C. § 78fff-1(a), the Trustee has the general powers of a bankruptcy trustee in a case under the Bankruptcy Code (in addition to the powers granted by SIPA pursuant to 15 U.S.C. § 78fff(b)). Chapters 1, 3, 5, and subchapters I and II of chapter 7 of the Bankruptcy Code apply to this proceeding to the extent consistent with SIPA.

20.     Pursuant to 15 U.S.C. § 78fff(b) and 78*lll*(7)(B), the Filing Date is deemed to be the date of the filing of the petition within the meaning of section 548 of the Bankruptcy Code and the date of the commencement of the case within the meaning of section 544 of the Bankruptcy Code.[2]

21.     The Trustee has standing to bring these claims pursuant to 15 U.S.C. § 78fff-1(a) and the Bankruptcy Code, including sections 323(b) and 704(a)(1), because, among other reasons:

  (a)     Mrs. Madoff received "Customer Property" as defined in 15 U.S.C. § 78*lll*(4);

  (b)     BLMIS incurred losses as a result of the claims set forth herein;

  (c)     BLMIS's customers were injured as a result of the conduct detailed herein;

  (d)     SIPC has not reimbursed, and statutorily cannot fully reimburse, all customers for all of their losses;

  (e)     the Trustee will not be able to fully satisfy all claims;

  (f)     the Trustee, as bailee of customer property, can sue on behalf of the customer bailors;

---

[2] Section 78*lll*(7)(B) of SIPA states that the filing date is "the date on which an application for a protective decree is filed under 78eee(a)(3)," except where the debtor is the subject of a proceeding pending before a United States court "in which a receiver, trustee, or liquidator for such debtor has been appointed and such proceeding was commenced before the date on which such application was filed, the term 'filing date' means the date on which such proceeding

(g)    the Trustee is the assignee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding (such claim-filing customers, collectively, "Accountholders"). As of the date hereof, the Trustee has received multiple express unconditional assignments of the applicable Accountholders' causes of action, which actions could have been asserted against Mrs. Madoff. As assignee, the Trustee stands in the shoes of persons who have suffered injury in fact and a distinct and palpable loss for which the Trustee is entitled to reimbursement in the form of monetary damages. The Trustee brings this action on behalf of, among others, those defrauded customers of BLMIS who invested more money in BLMIS than they withdrew; and

(h)    SIPC is the subrogee of claims paid, and to be paid, to customers of BLMIS who have filed claims in the liquidation proceeding. SIPC has expressly conferred upon the Trustee enforcement of its rights of subrogation with respect to payments it has made and is making to customers of BLMIS from SIPC funds.

## THE FRAUDULENT PONZI SCHEME

22.    Founded in 1959, BLMIS began operations as a sole proprietorship of Madoff and later, effective January 2001, formed as a New York limited liability company wholly owned by Madoff. Since in or about 1986, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as founder, proprietor, chairman, and chief executive officer, ran BLMIS together with several family members and a number of additional employees. BLMIS was registered with the SEC as a securities broker-dealer under section 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78*o*(b). By that registration, BLMIS

---

was commenced." 15 U.S.C. § 78*lll*(7)(B). Thus, even though the application for a protective decree was filed on December 15, 2008, the Filing Date in this action is December 11, 2008.

is a member of SIPC. BLMIS had three business units: investment advisory (the "IA Business"), market making and proprietary trading.

23.     For certain accounts in the IA Business, BLMIS purported to participate in a capital appreciation/depreciation strategy, depending on whether the customer sought to generate gains or losses. For example, the strategy was executed by either purporting to purchase small groups of securities near lows and then purporting to sell those same securities at highs, or by purporting to short-sell securities near highs and then purporting to repurchase those securities near lows.

24.     For other accounts, Madoff described the IA Business' strategy as a "split-strike conversion" strategy. Madoff promised these clients that their funds would be invested in a basket of common stocks within the S&P 100 Index, which is a collection of the 100 largest U.S. publicly traded companies. The basket of stocks would be intended to mimic the movement of the S&P 100 Index. Madoff asserted that he would carefully time purchases and sales to maximize value, but this meant that the clients' funds would intermittently be out of the market, at which times they would purportedly be invested in U.S. issued securities and money market funds. The second part of the split-strike conversion strategy was the hedge of such purchases with option contracts. Madoff purported to purchase and sell S&P 100 Index option contracts that closely corresponded with the stocks in the basket, thereby controlling the downside risk of price changes in the basket of stocks.

25.     Although clients of the IA Business received monthly or quarterly statements purportedly showing the securities that were held in – or had been traded through – their accounts, as well as the growth of and profit from those accounts over time, the trades reported on these statements were a complete fabrication. The security purchases and sales depicted in the account statements virtually never occurred and the profits reported were entirely fictitious.

At his Plea Hearing, Madoff admitted that he never in fact purchased any of the securities he claimed to have purchased for customer accounts. *See* Plea Allocution of Bernard L. Madoff at 3, *United States v. Madoff*, No. 09-CR-213 (DC) (S.D.N.Y. March 12, 2009) (Docket No. 50). Indeed, based on the Trustee's investigation to date and with the exception of isolated individual trades for certain clients, there is no record of BLMIS having cleared any purchase or sale of securities on behalf of the IA Business at the Depository Trust & Clearing Corporation, the clearing house for such transactions.

26.     Prior to his arrest, Madoff assured clients and regulators that he conducted all trades on the over-the-counter market after hours. To bolster that lie, Madoff periodically wired tens of millions of dollars to BLMIS's affiliate, Madoff Securities International Ltd. ("MSIL"), a London-based entity substantially owned by Madoff and his family. There are no records that MSIL ever used the wired funds to purchase securities for the accounts of the IA Business clients.

27.     Additionally, based on the Trustee's investigation to date, there is no evidence that BLMIS ever purchased or sold any of the options that Madoff claimed on customer statements to have purchased and sold.

28.     For all periods relevant hereto, the IA Business was operated as a Ponzi scheme and Madoff and his co-conspirators concealed the ongoing fraud in an effort to hinder, delay or defraud other current and prospective customers of BLMIS. The money received from investors was not set aside to buy securities as purported, but instead was primarily used to make the distributions to – or payments on behalf of – other investors. In short, the money sent to BLMIS for investment was simply used to keep the Ponzi scheme going and to enrich Madoff, his associates and others, including Mrs. Madoff, until such time as the requests for redemptions in

December 2008 overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme.

29.     The payments to investors constituted an intentional misrepresentation of fact regarding the underlying accounts and were an integral and essential part of the fraud. The payments were necessary to validate the false account statements, and were made to avoid detection of the fraud, to retain existing investors and to lure other investors into the Ponzi scheme.

30.     During the scheme, certain investors requested and received distributions of the so-called "profits" listed for their accounts which were nothing more than fictitious profits. Other investors, from time to time, redeemed or closed their accounts, or removed portions of purportedly available funds, and were paid consistent with the statements they had been receiving. Some of those investors later re-invested part or all of those withdrawn payments with BLMIS.

31.     When payments were made to or on behalf of these investors, the falsified monthly statements of accounts reported that the accounts of such investors included substantial gains. In reality, BLMIS had not invested the investors' principal as reflected in customer statements. In an attempt to conceal the ongoing fraud and thereby hinder, delay or defraud other current and prospective investors, BLMIS paid to or on behalf of certain investors the inflated amounts reflected in the falsified financial statements, including principal and/or fictitious profits.

32.     BLMIS used the funds deposited from new investments to continue operations and pay redemption proceeds to or on behalf of other investors and to make other transfers. Due to the siphoning and diversion of new investments to fund redemptions requested by other investors, BLMIS did not have the funds to pay investors on account of their new investments.

BLMIS was able to stay afloat only by using the principal invested by some clients to pay other investors or their designees.

33.     In an effort to hinder, delay or defraud authorities from detecting the fraud, BLMIS did not register as an Investment Advisor until September 2006.

34.     In or about January 2008, BLMIS filed with the SEC a Uniform Application for Investment Adviser Registration.  The application represented, inter alia, that BLMIS had 23 customer accounts and assets under management of approximately $17.1 billion.  In fact, in January 2008, BLMIS had approximately 4,900 active client accounts with a purported value of approximately $65 billion under management.

35.     Not only did Madoff seek to evade regulators, Madoff also had false audit reports "prepared" by Friehling & Horowitz, a three-person accounting firm in Rockland County, New York.  Of the two accountants at the firm, one was semi-retired and living in Florida for many years prior to the Filing Date.

36.     At all times relevant hereto, the liabilities of BLMIS were billions of dollars greater than the assets of BLMIS.  At all relevant times, BLMIS was insolvent in that (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

## THE PONZI SCHEME BENEFITED MRS. MADOFF

37.     Mrs. Madoff received substantial transfers of money from BLMIS which belonged to the Company and, ultimately, its customers.

38.     The Trustee has thus far identified at least $14,132,688 that Mrs. Madoff received from BLMIS which is recoverable through this action.  (*See* Exhibit A attached hereto for a detailed list of all such transfers).

39.     Between 1996 and 2008, Mrs. Madoff was paid a total of $1,568,567 in salary.
Records available to the Trustee demonstrate that while Mrs. Madoff appears on BLMIS's books
and records as holding an unspecified "managerial position," there is no indication that Mrs.
Madoff ever performed any services for or provided any value to the Company in exchange for
the salary and the benefits she received. Upon information and belief, this title was created to
give the appearance that Mrs. Madoff was legitimately employed at BLMIS in order to falsely
justify her compensation.

40.     Mrs. Madoff did not maintain an office at BLMIS, did not have a BLMIS email
account or hold any other indicia consistent with employment other than her salary. The
Trustee's investigation as of the date of this Complaint, including interviews of former BLMIS
employees, has indicated that she did not in fact work at BLMIS. Yet for nearly 13 years, Mrs.
Madoff continued to receive a substantial "salary" from BLMIS.

41.     Mrs. Madoff knew, or should have known, that she was not entitled to receive a
salary or compensation for a job she did not have and that did not exist. This money belonged to
BLMIS and ultimately its customers. Mrs. Madoff exercised unauthorized control over this
money with the knowledge that she was not entitled to receive it, as she provided no
corresponding benefit or value to BLMIS in return.

42.     In addition, Mrs. Madoff enjoyed access to BLMIS corporate American Express
charge cards. Between 2002 and 2008, BLMIS funds were used to pay for approximately
$55,071 in personal expenses charged to these cards. The charges included, for example, an
$18,452 charge at the Four Seasons Hotel in Las Vegas, Nevada, a $2,712 charge at a luxury
clothing boutique on Long Island and numerous charges at high-end restaurants and cafes in
places like New York City and Palm Beach, Florida.

43.     Mrs. Madoff knew or should have known that she was not entitled to use BLMIS monies to pay for her personal luxuries and expenses. Mrs. Madoff also knew or should have known that she did not earn, nor was she otherwise entitled to, any "salary" or other payments from BLMIS. Mrs. Madoff exercised unauthorized control over this money with the knowledge that she was not entitled to receive it. Mrs. Madoff provided no corresponding benefit or value to BLMIS in return.

44.     Mrs. Madoff was accustomed to reaping the benefits of fraudulently diverted BLMIS proceeds at the expense of BLMIS and its customers. In addition to her "salary" and American Express charges, the Trustee has identified at least $12,509,050 transferred to Marion Madoff and/or to Peter Madoff for the benefit of Marion Madoff, for which Mrs. Madoff is solely and/or jointly and severally liable with her husband Peter Madoff, and for which BLMIS received no corresponding benefit or value:

- BLMIS funds were used to pay off the balance of the mortgage on Peter and Marion Madoff's home in Old Westbury, NY. The Madoffs purchased this home on November 16, 1990 for $2.5 million and took out a $1.5 million mortgage on it. BLMIS paid off the mortgage on the house on May 31, 2002 in the amount of $714,401.12, using funds from one of the accounts maintained as part of the IA Business. Mrs. Madoff owns the home along with Peter Madoff as tenants by the entirety. As the beneficiary of the aforementioned improper transfer, Mrs. Madoff is jointly and severally liable in the amount of $714,401.12;

- BLMIS funds were used for Peter and Marion Madoff's purchase of their New York City co-op apartment. On April 14 and June 2, 2004, transfers in the amounts of $450,000 and $4,000,000, respectively, were wired from one of the BLMIS accounts used for the IA business to Peter Madoff's account at HSBC in connection with the purchase of this apartment, which is located on Park Avenue, New York, NY. Mrs. Madoff owns this co-op along with Peter Madoff as tenants by the entirety. As the beneficiary of the aforementioned improper transfers, Mrs. Madoff is jointly and severally liable in the amount of $4,450,000;

- In 2001, $4,244,649 of BLMIS funds were used for Peter and Marion Madoff's purchase of their Palm Beach home. In May of 2001, Peter Madoff's sister-in-law, Ruth Madoff, "loaned" him $4,200,000 in

connection with the purchase of a home located in Palm Beach, FL. That money, however, was wired directly to Peter Madoff's real estate agents and lawyers from various BLMIS operating accounts. Specifically, the funds were transferred through three separate payments: $10,000 on March 27, 2001 to Sotheby's International Realty; $365,200 on April 18, 2001 to Sotheby's International Realty; and, $3,869,449 on April 30, 2001 to Koeppel, Gottlieb & Mesches. Although the Madoffs purchased this property some five years earlier and jointly owned it during that time period, on November 8, 2006 the ownership of this property was transferred solely into Mrs. Madoff's name. As the beneficiary of the aforementioned improper transfers, Mrs. Madoff is jointly and severally liable in the amount of $4,244,649;

- Mrs. Madoff maintained a cellular phone paid for by BLMIS. She was also provided with gas cards paid for by BLMIS.

45.     In addition to benefitting herself, Mrs. Madoff engaged in activities that diverted BLMIS money for the benefit of her family members. For example, on March 28, 2008, a wire transfer in the amount of $300,000 was sent from a BLMIS account to an HSBC bank account to or for the benefit of Mrs. Madoff. On the same day, $280,000 was sent from Mrs. Madoff's account to her daughter, Shana Madoff. This payment appears to have been used as a down payment on Shana Madoff's home in East Hampton. On May 8, 2008, another wire transfer in the amount of $2,800,000 was sent from a BLMIS account to the HSBC bank account to or for the benefit of Mrs. Madoff. The following day, May 9, 2008, $2,619,000, which appears to have been the balance due at closing on Shana Madoff's home, was transferred from Mrs. Madoff's account to an account at JPMorgan Chase for the benefit of Biondo & Hammer, LLP, a law firm in Montauk, New York. BLMIS received no corresponding benefit for the $3,100,000 transferred to Mrs. Madoff (and subsequently transferred to or for the benefit of Shana Madoff) via the foregoing two transactions.

### NATURE OF THE CLAIMS AGAINST MRS. MADOFF

46.     At all times relevant hereto, BLMIS was insolvent in that (i) its assets were worth billions of dollars less than the value of its liabilities; (ii) it could not meet its obligations as they

came due; or (iii) at the time of the transfers to Mrs. Madoff described herein, BLMIS was left with insufficient capital.

47.    This adversary proceeding is being brought to recapture monies paid to or for the benefit of Mrs. Madoff so that this customer property can be recovered for the benefit of the estate of BLMIS.

48.    The Trustee also seeks an accounting for all monies received by Mrs. Madoff from BLMIS and a constructive trust as a result of the past unjust enrichment of—and to prevent any further unjust enrichment by—Mrs. Madoff on all assets she received or receives in connection with BLMIS.  The accounting is necessary in this case in light of the need to determine the exact amount of the BLMIS money improperly transferred to Mrs. Madoff to finance her personal life, and because complete information regarding the amount of such transfers misused by Mrs. Madoff for her own benefit is within her possession, custody, and control.  And the constructive trust is necessary because the money that was improperly transferred to Mrs. Madoff is customer property within the meaning of the applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

49.    The transfers of money to Mrs. Madoff were and continue to be customer property within the meaning of 15 U.S.C. §§ 78fff-2(c)(3) and 78*lll*(4).

50.    Prior to the Filing Date, BLMIS made payments or other transfers to or for the benefit of Mrs. Madoff of at least $14,132,688 (the "Transfers") as set forth on Exhibit A, under circumstances which did or should have put Mrs. Madoff on notice that the Transfers were fraudulent.

51.    The Transfers are avoidable and recoverable under sections 544, 548, 550(a) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3), applicable provisions of NY CPLR 203(g), 213(8) and DCL sections 273-279.

52.     A total of 220 transfers in the collective amount of $8,403,179 (the "Six Year Transfers") were made during the six years prior to the Filing Date and are avoidable and recoverable under sections 544, 550(a), and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3) and DCL sections 273-279.

53.     Of the Six Year Transfers, at least 74 in the collective amount of $3,452,687 (the "Two Year Transfers") were made during the two years prior to the Filing Date, and are additionally recoverable under sections 548(a)(1), 550(a), and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. 78fff-2(c)(3).

54.     To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

55.     The Trustee's investigation is on-going and the Trustee reserves the right to (i) supplement the information on all transfers mentioned herein and any additional transfers, and (ii) seek recovery of such additional transfers.

## FIRST CAUSE OF ACTION
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(A), 550(a), AND 551

56.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

57.     Each of the Two Year Transfers was made to or for the benefit of Mrs. Madoff on or within two years before the Filing Date.

58.     Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

59.     Each of the Two Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud some or all of BLMIS's then-existing or future creditors.

60.     Each of the Two Year Transfers constitutes a fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from Mrs. Madoff pursuant to section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

61.     As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Mrs. Madoff: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; and (c) recovering the Two Year Transfers, or the value thereof, from Mrs. Madoff for the benefit of the estate of BLMIS.

### SECOND CAUSE OF ACTION
### FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B) , 550(a), AND 551

62.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

63.     Each of the Two Year Transfers was made to or for the benefit of Mrs. Madoff on or within two years before the Filing Date.

64.     Each of the Two Year Transfers constituted a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

65.     BLMIS received less than reasonably equivalent value in exchange for each of the Two Year Transfers.

66.     At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent, as a result of the Two Year Transfers.

67.     At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with BLMIS was an unreasonably small capital.

68. At the time BLMIS made each of the Two Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts mature.

69. Each of the Two Year Transfers constitutes a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from Mrs. Madoff pursuant to section 550(a) of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

70. As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Mrs. Madoff: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; and (c) recovering the Two Year Transfers, or the value thereof, from Mrs. Madoff for the benefit of the estate of BLMIS.

**THIRD CAUSE OF ACTION**
**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a), AND 551**

71. The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

72. At all times relevant to the Six Year Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

73. Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

74.     Each of the Six Year Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made each of the Six Year Transfers to, or for the benefit of, Mrs. Madoff in furtherance of a fraudulent investment scheme.

75.     Each of the Six Year Transfers was received by Mrs. Madoff with the actual intent to hinder, delay, or defraud the creditors of BLMIS at the time of each of the Six Year Transfers and/or future creditors of BLMIS.

76.     As a result of the foregoing, pursuant to DCL 276, 276-a, 278 and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Mrs. Madoff: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from Mrs. Madoff for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from Mrs. Madoff.

**FOURTH CAUSE OF ACTION**
**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a), AND 551**

77.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

78.     At all times relevant to the Six Year Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

79.     Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

80.     BLMIS did not receive fair consideration for the Six Year Transfers.

81. BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the alternative, BLMIS became insolvent as a result of each of the Six Year Transfers.

82. As a result of the foregoing, pursuant to DCL sections 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Mrs. Madoff: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, for the benefit of the estate of BLMIS.

**FIFTH CAUSE OF ACTION**
**FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 274, 278 AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a), AND 551**

83. The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

84. At all times relevant to the Six Year Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

85. Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

86. BLMIS did not receive fair consideration for the Six Year Transfers.

87. At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Transfers was an unreasonably small capital.

88. As a result of the foregoing, pursuant to DCL sections 274, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the

Trustee is entitled to a judgment against Mrs. Madoff: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from Mrs. Madoff for the benefit of the estate of BLMIS.

## SIXTH CAUSE OF ACTION
### FRAUDULENT TRANSFER – NEW YORK DEBTOR AND CREDITOR LAW §§ 275, 278, AND/OR 279, AND 11 U.S.C. §§ 544(b), 550(a), AND 551

89.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

90.     At all times relevant to the Six Year Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that are allowable under section 502 of the Bankruptcy Code or that are not allowable only under section 502(e) of the Bankruptcy Code.

91.     Each of the Six Year Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

92.     BLMIS did not receive fair consideration for the Six Year Transfers.

93.     At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

94.     As a result of the foregoing, pursuant to DCL sections 275, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Mrs. Madoff: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from Mrs. Madoff for the benefit of the estate of BLMIS.

## SEVENTH CAUSE OF ACTION
## RECOVERY OF ALL FRAUDULENT TRANSFERS – NEW YORK CIVIL
## PROCEDURE LAW AND RULES 203(g), 213(8) AND NEW YORK DEBTOR AND
## CREDITOR LAW §§ 276, 276-a, 278, AND/OR 279, 11 U.S.C. §§ 544, 550(a), AND 551

95.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

96.     At all times relevant to the Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS.

97.     At all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

98.     Each of the Transfers constituted a conveyance by BLMIS as defined under DCL section 270.

99.     Each of the Transfers was made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS at the time of each of the Transfers and/or future creditors of BLMIS.  BLMIS made the Transfers to or for the benefit of Mrs. Madoff in furtherance of a fraudulent investment scheme.

100.     Each of the Transfers was received by Mrs. Madoff with actual intent to hinder, delay or defraud creditors of BLMIS at the time of each of the Transfers, and/or future creditors of BLMIS.

101.     As a result of the foregoing, pursuant to NY CPLR 203(g), 213(8) and DCL sections 276, 276-a, 278, and/or 279, sections 544, 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against Mrs. Madoff: (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; (c) recovering the

Transfers, or the value thereof, from Mrs. Madoff for the benefit of the consolidated estate of BLMIS; and (d) recovering attorneys' fees from Mrs. Madoff.

## EIGHTH CAUSE OF ACTION
## CONVERSION

102.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

103.    BLMIS customers have the possessory right and interest to the billions of dollars they personally invested with BLMIS.

104.    Payments and transfers received by Mrs. Madoff in the form of phony salary payments and other transfers, to which Mrs. Madoff knew she had no right, were taken from monies, consisting of Customer Property, withdrawn from BLMIS.

105.    Mrs. Madoff has intentionally exercised dominion and control over customer money in a manner inconsistent with and in willful disregard of the customers' interests.  Mrs. Madoff is therefore liable to customers for having wrongfully converted these monies and is now obligated to return all such monies.

106.    As a direct and proximate result of this conduct, BLMIS and its creditors have not had the use of the money converted by Mrs. Madoff.

107.    By reason of the above, the Trustee, on behalf of BLMIS and its creditors, is entitled to an award of compensatory damages, in an amount to be determined at trial.

## NINTH CAUSE OF ACTION
## UNJUST ENRICHMENT

108.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

109.    Mrs. Madoff has been unjustly enriched.  Mrs. Madoff has wrongfully and unconscionably benefited from the receipt of BLMIS customers' money in the form of payments

of salary, proceeds, and other transfers, which were the property of BLMIS and its customers, and for which Mrs. Madoff did not adequately compensate BLMIS or provide value or fair consideration.

110.    Mrs. Madoff has been enriched at the expense of the Trustee and, ultimately, at the expense of BLMIS's customers.

111.    Equity and good conscience require full restitution of the monies received by Mrs. Madoff, directly and indirectly, from BLMIS.

112.    By reason of the above, the Trustee, on behalf of BLMIS and its creditors, is entitled to restitution for the benefits Mrs. Madoff improperly received, in an amount to be determined at trial.

**TENTH CAUSE OF ACTION**
**<u>CONSTRUCTIVE TRUST</u>**

113.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

114.    As set forth above, the assets of BLMIS have been wrongfully diverted as a result of fraudulent conveyances, conversions, and other wrongdoing of Mrs. Madoff for her own, and her family's, individual interests and enrichment.

115.    The Trustee has no adequate remedy at law.

116.    Because of the past unjust enrichment of Mrs. Madoff, the Trustee is entitled to the imposition of a constructive trust with respect to any transfer of funds, assets, or property from BLMIS as well as to any profits received by Mrs. Madoff in the past or on a going forward basis in connection with BLMIS.

117.    In addition, upon information and belief, with the sums Ms. Madoff received as a result of fraudulent conveyances, fraudulent transfers, conversions and other wrongdoing, Mrs.

Madoff purchased the properties in Palm Beach, FL, Old Westbury, NY and New York, New York, mentioned previously in this Complaint, which should be held in trust for the Trustee's use, benefit, and account.

### ELEVENTH CAUSE OF ACTION
### ACCOUNTING

118.    The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

119.    As set forth above, the assets of BLMIS have been wrongfully diverted as a result of fraudulent conveyances, conversions, and other wrongdoing of Mrs. Madoff for her own, and her family's, individual interests and enrichment.

120.    The Trustee has no adequate remedy at law.

121.    To compensate BLMIS for the amount of monies Mrs. Madoff diverted from BLMIS for her own benefit, it is necessary for Mrs. Madoff to provide an accounting of any transfer of funds, assets, or property received from BLMIS, as well as to any profits in the past and on a going forward basis in connection with BLMIS.  Complete information regarding the amount of such transfers misused by Mrs. Madoff for her own benefit is within her possession, custody, and control.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against Mrs. Madoff as follows:

(a)    on the First Cause of Action, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), a judgment: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; and (c) recovering the Two Year Transfers, or the value thereof, from Mrs. Madoff for the benefit of the estate of BLMIS;

(b)     on the Second Cause of Action, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3), a judgment: (a) avoiding and preserving the Two Year Transfers; (b) directing that the Two Year Transfers be set aside; and (c) recovering the Two Year Transfers, or the value thereof, from Mrs. Madoff for the benefit of the estate of BLMIS;

(c)     on the Third Cause of Action, pursuant to DCL sections 276, 276-a, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from Mrs. Madoff for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from Mrs. Madoff;

(d)     on the Fourth Cause of Action, pursuant to DCL sections 273, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from Mrs. Madoff for the benefit of the estate of BLMIS;

(e)     on the Fifth Cause of Action, pursuant to DCL sections 274, 278, and/or 279, sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from Mrs. Madoff for the benefit of the estate of BLMIS;

(f)     on the Sixth Cause of Action, pursuant to DCL sections 275, 278, and/or 279, sections 544(b), 550, and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), a judgment: (a) avoiding and preserving the Six Year Transfers; (b) directing that the Six Year Transfers be set aside; and (c) recovering the Six Year Transfers, or the value thereof, from Mrs. Madoff for the benefit of the estate of BLMIS;

(g)     on the Seventh Cause of Action, pursuant to NY CPLR 203(g) and 213(8), DCL sections 276, 276-a, 278, and/or 279, and sections 544(b), 550(a), and 551 of the Bankruptcy Code, a judgment: (a) avoiding and preserving the Transfers; (b) directing that the Transfers be set aside; (c) recovering the Transfers, or the value thereof, from Mrs. Madoff for the benefit of the estate of BLMIS; and (d) recovering attorneys' fees from Mrs. Madoff;

(h)     on the Eighth Cause of Action against Mrs. Madoff for the conversion of BLMIS assets, a judgment for compensatory damages in amounts to be determined at trial;

(i)     on the Ninth Cause of Action against Mrs. Madoff for unjust enrichment, a judgment for restitution in an amount to be determined at trial;

(j)     on the Tenth Cause of Action against Mrs. Madoff, a judgment for the imposition of a constructive trust upon any transfer of funds, assets, or property received from BLMIS as well as to any profits in the past and on a going forward basis received by Mrs. Madoff in connection with BLMIS, in favor of the Trustee for the benefit of BLMIS's estate;

(k)     on the Eleventh Cause of Action against Mrs. Madoff for an accounting of any transfer of funds, assets, or property received from BLMIS, as well as any profits

in the past and on a going forward basis derived from funds originated from BLMIS and received by Mrs. Madoff;

(l) on all Claims for Relief, pursuant to common law and NY CPLR 5001 and 5004 awarding the Trustee prejudgment interest from the date on which any transfer of BLMIS funds, assets, or property were received by Mrs. Madoff;

(m) awarding the Trustee all applicable attorneys' fees, interest, costs, and disbursements of this action;

(n) granting the Trustee such other, further, and different relief as the Court deems just, proper, and equitable.

Date: November 23, 2010

BY: *s/ Keith R. Murphy*
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com
Keith R. Murphy
Email: kmurphy@bakerlaw.com

Of Counsel:

**BAKER & HOSTETLER LLP**
John Siegal
Email: jsiegal@bakerlaw.com
Jimmy Fokas
Email: jfokas@bakerlaw.com
Sammi Malek
Email: smalek@bakerlaw.com

**BAKER & HOSTETLER LLP**
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Irving H. Picard, Esq.,*
*Trustee for the SIPA Liquidation of Bernard L.*
*Madoff Investment Securities LLC*